# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW YORK CIVIL LIBERTIES UNION, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOMELAND SECURITY. <br><br> Defendant. | **COMPLAINT** <br><br> 09 Civ. 5325 (JGK) <br><br> ECF Case |

### Preliminary Statement

1. This is an action under the Freedom of Information Act ("FOIA"), seeking the release of agency records requested on October 5, 2007 by Plaintiff New York Civil Liberties Union ("NYCLU") from Defendant United States Department of Homeland Security ("DHS"), pertaining to a massive surveillance system called the "Lower Manhattan Security Iniative" ("LMSI"), being planned for and implemented in downtown Manhattan.

2. Under the LMSI system, the federal government will help fund a $100 million project by the New York City Police Department to create a network of thousands of cameras to monitor and track vehicles and pedestrians in the area south of Canal Street in Manhattan. Once implemented, the system will allow the New York City Police Department ("NYPD"), and possibly the federal government, to create and maintain a database of the movement and whereabouts of millions of law-abiding New Yorkers. Therefore, the system's planning and implementation raise enormous implications for

privacy rights and the lack of public input into the system. Thus, the NYCLU is particularly interested in public disclosure about the scope of the information the system would collect about law-abiding New Yorkers; how the police and federal government would use that information; with whom the police and federal government would share the information; how long the police and federal government would keep the information; any privacy protections that would be part of the system; which private surveillance cameras would become part of the LMSI system; and the extent to which federal funds were being used to create the system.

3. Given the vast privacy implications of the LMSI system, in October 2007 the NYCLU served a FOIA request on DHS's Privacy Office seeking a range of documents pertaining to the planned surveillance system. The Privacy Office then forwarded the NYCLU's request to multiple other DHS components it believed would possess responsive records, but—with the exception of one component that disclosed eight pages of heavily redacted records—none of the other components has located any responsive records. Similarly, the Privacy Office itself initially located no responsive records and only turned over a small number of responsive records after the NYCLU filed a second FOIA request with the Privacy Office.

4. Further, neither the Privacy Office nor any of the other components have timely responded to the NYCLU's administrative appeals.

5. DHS's actions, therefore, violate FOIA and the NYCLU seeks an order that DHS conduct a thorough search for all responsive records, immediately process all located records, promptly disclose the requested records in their entirety and make copies

available to the NYCLU, and award the NYCLU its costs and reasonable attorneys' fees incurred in this action.

## Jurisdiction and Venue

6. This Court has subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. § 552(a)(4)(B) and 5 U.S.C. § 552(a)(4)(A)(vii) and 5 U.S.C. § 702. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§ 701-706. Venue is proper in this district under 5 U.S.C. § 552(a)(4)(B).

## Parties

7. Plaintiff New York Civil Liberties Union ("NYCLU") is the New York State affiliate of the American Civil Liberties Union. The NYCLU is a not-for-profit corporation that defends the civil rights and civil liberties of New Yorkers. To inform the public about government conduct affecting legal rights, the NYCLU publishes newsletters, press releases, know-your-rights handbooks, and numerous other materials. NYCLU publications are available to everyone -- including tax-exempt organizations, not-for-profit groups, law students, and academics -- for no cost or for a nominal fee. The NYCLU also disseminates information through its website -- www.nyclu.org -- and through an electronic newsletter, which is received by thousands of subscribers.

8. Defendant United States Department of Homeland Security ("DHS") is a Department of the Executive Branch of the United States government, and an agency within the meaning of 5 U.S.C. § 552(f)(1).

### The FOIA Request and the Agency's Response

9.     On October 5, 2007, Plaintiff filed a FOIA request with DHS's Privacy Office seeking: (1) documents received by DHS from the City of New York or the NYPD, or any entities acting on their behalf or as their agent(s), concerning the LMSI, since January 1, 2002; (2) documents sent by DHS to the City of New York or the NYPD, or any entities acting on their behalf or as their agent(s), concerning the LMSI, since January 1, 2002; (3) records in the possession or control of DHS (whether created by DHS or not) that evaluate, assess, describe, authorize, or otherwise discuss the NYPD plan to place a system of video cameras in lower Manhattan in New York City; and (4) records in the possession or control of DHS (whether created by DHS or not) that evaluate, assess, describe, authorize, or otherwise discuss video surveillance systems proposed or employed other than in New York City. This request included, but was not limited to, records concerning the so-called "Ring of Steel" system in London, England. *See* Ex. A (original FOIA request).

10.     In response to this request, DHS identified a total of five of its component offices that could contain responsive records: (1) Privacy Office/Executive Secretariat; (2) National Protection and Programs Directorate ("NPPD"); (3) Office of Intelligence and Analysis ("OI&A"); (4) Office of Infrastructure and Geophysical Division ("OIGD"); and (5) Federal Emergency Management Agency ("FEMA").

*Privacy Office*

11.     The NYCLU's original request was to the Privacy Office, which responded on October 25, 2007 that it believed that NPPD and FEMA would have responsive records,

and, thus, had forwarded the request to those components. Later, the Privacy Office also informed the NYCLU that it believed OI&A might also have responsive records.

12. In a letter dated November 8, 2007, the Privacy Office wrote to the NYCLU to state that it did not possess any responsive records, but that this determination pertained only to the Privacy Office's response, and that the request had been forwarded to OI&A, NPPD and FEMA.

13. Later, on February 6, 2008, after none of the components identified by the Privacy Office located any responsive records, the NYCLU sent a second FOIA request to the Privacy Office, seeking the same documents it had sought in its October 5, 2007 FOIA request. The NYCLU stated that it had not administratively appealed the Privacy Office's November 2007 response that it could not locate any responsive records because, at that time, the NYCLU was under the impression that the other components—namely NPPD, OI&A and FEMA—would locate responsive records.

14. In a letter dated June 26, 2008, the Privacy Office stated that it was beginning to release to the NYCLU records responsive to the February 6, 2008 FOIA request, attaching to its letter a DHS "Business Opportunities" announcement for "Vehicle Identification/tracking Systems (VI/TS) and License Plate Readers," as well as four packets from vendors of such equipment (two of such packets were fully disclosed, and two were partially redacted). The Privacy Office asked that the NYCLU hold in abeyance any administrative appeal, while the Privacy Office continued to locate and release other responsive records.

15. Next, as stated in a letter dated August 4, 2008, the Privacy Office disclosed three more vender responses (one of which was disclosed entirely, and two of which were

disclosed with redactions), asking once again that the NYCLU hold in abeyance any administrative appeal pending a final Privacy Office determination on the request..

16. As stated in a final response letter from the Privacy Office, dated September 3, 2008, the office disclosed two partially redacted vendor responses and stated it was withholding one thirteen-page vendor response.

17. In a letter dated October 30, 2008, the NYCLU administratively appealed the adequacy of the Privacy Office's search for responsive records, as well as the office's withholding of the entire thirteen-page vendor response identified in the September 3, 2008 response letter.

18. To date the Privacy Office has not responded to the NYCLU's administrative appeal other than to state that the appeal is in a queue to be processed.

*Federal Emergency Management Agency ("FEMA")*

19. In a letter dated October 25, 2007, the DHS Privacy Office notified the NYCLU that it had referred the NYCLU's October 5, 2007 FOIA request to FEMA, among other DHS components.

20. After the Privacy Office had forwarded to FEMA the NYCLU's October 5, 2007 FOIA request, FEMA, in a letter dated January 26, 2009, indicated that it was disclosing eight pages of records responsive to the NYCLU's request. The letter was accompanied by those eight pages, which were grant funding requests made from entities in New York State, New York City's urban area and Buffalo's urban area to FEMA, State Homeland Security Program (SHSP), Law Enforcement Terrorism Prevention Program (LETPP), Citizen Corps Program (CCP), Urban Areas Security Initiative (UASI), and Metropolitan Medical Response System (MMRS). On each page, the

information redacted for each funding request was the "Investment Name" and "Investment Summary/Purpose" for each project.

21. In a letter dated March 18, 2009, Plaintiff administratively appealed FEMA's partial denial of access to the "Investment Name" and "Investment Summary/Purpose" in the eight responsive pages it disclosed. Plaintiff cited, *inter alia*, President Obama's January 2009 FOIA memorandum, which calls for a presumption of openness in processing and responding to FOIA requests.

22. In a letter dated March 23, 2009, Plaintiff sent an addendum to its March 18 administrative appeal letter, asking that DHS representatives consider the U.S. Attorney General's March 19, 2009 FOIA memorandum to executive department and agency heads, which (like the President's January 2009 memorandum) calls for a presumption of openness and explains that all records should be disclosed, even if the agency could, as a matter of law, withhold a record or record portion.

23. To date FEMA has not responded to the NYCLU's administrative appeal.

*National Protection and Programs Directorate ("NPPD")*

24. In a letter dated October 25, 2007, the DHS Privacy Office notified the NYCLU that it had referred the NYCLU's October 5, 2007 FOIA request to NPPD, among other DHS components.

25. In a letter dated January 18, 2008, NPPD stated that it had not located any responsive records but would transfer the request to the Office of Infrastructure and Geophysical Division ("OIGD").

26. In a letter dated February 6, 2008, the NYCLU administratively appealed the adequacy of NPPD's search for responsive records, especially given that the Privacy

7

Office itself had referred the NYLCU's request to NPPD on the belief that NPPD was likely to possess responsive records.

27. To date NPPD has not responded to the NYCLU's administrative appeal other than to state that the appeal is in a queue to be processed.

*Office of Intelligence and Analysis ("OI&A")*

28. In a letter dated October 31, 2007, the DHS Privacy Office notified the NYCLU that it had referred the NYCLU's October 5, 2007 FOIA request to OI&A, in addition to other DHS components.

29. After the Privacy Office had forwarded to OI&A the NYCLU's October 5, 2007 request, OI&A, in a letter dated December 11, 2007, stated that it had not located any records responsive to Plaintiff's FOIA request.

30. In a letter dated February 6, 2008, the NYCLU mailed an administrative appeal letter to OI&A, alleging that the component had failed to perform an adequate search for responsive records, especially given that the Privacy Office had referred the request to that component.

31. To date OI&A has not responded to the NYCLU's administrative appeal other than to state that the appeal is in a queue to be processed.

*Office of Infrastructure and Geophysical Division ("OIGD")*

32. In a letter dated January 18, 2008, NPPD advised the NYCLU that it was forwarding the NYCLU's October 5, 2007 FOIA request to OIGD.

33. In a letter dated January 29, 2008, advised the NYCLU that it had not located any responsive records.

34. In a letter dated February 6, 2008, the NYCLU mailed an administrative appeal letter to OIGD, alleging that the component had failed to perform an adequate search for responsive records, especially given that the Privacy Office had referred the request to that component.

35. To date OIGD has not responded to the NYCLU's administrative appeal other than to state that the appeal is in a queue to be processed.

### Causes of Action

36. Defendant has violated 5 U.S.C. § 552(a)(3), (6)(A)(ii), by failing to make timely determinations on Plaintiff's administrative appeals and to thoroughly search for, locate and disclose the requested records.

### Requested Relief

WHEREFORE, Plaintiff requests that this Court:

1. Order Defendant to conduct a thorough search for all responsive records;

2. Order Defendant to immediately process all located records;

3. Order Defendant to promptly disclose the requested records in their entirety, and make copies available to Plaintiff;

4. Award Plaintiff its costs and reasonable attorneys' fees incurred in this action under 5 U.S.C. § 552(a)(4)(E); and

5. Grant such other relief as the Court may deem just and proper.

Respectfully submitted,

NEW YORK CIVIL LIBERTIES UNION
FOUNDATION, by


s/Matthew Faiella
MATTHEW FAIELLA (MF-9423)
CHRISTOPHER DUNN (CD-3991)
ARTHUR EISENBERG (AE-2012)
125 Broad Street, 19th Floor
New York, New York 10004-2400
(212) 607-3300

Dated: June 9, 2009
       New York, NY


125 Broad Street
New York, NY 10004
(212) 607 3300
Fax (212) 607 3318
www.nyclu.org

Christopher Dunn
Associate Legal Director
(212) 607-3300, ext. 326
cdunn@nyclu.org

October 5, 2007

Catherine M. Papoi
Deputy Chief FOIA Officer
The Privacy Office
U.S. Department of Homeland Security
245 Murray Drive SW, Building 410
Washington, D.C. 20528-0550



RECEIVED
OCT 17 2007
By 08-040

Re: Freedom of Information Act Request for Records Concerning
"Lower Manhattan Security Initiative"

Dear Ms. Papoi:

This letter constitutes a request to the Department of Homeland Security under the Freedom of Information Act, 5 U.S.C. § 552 (FOIA), by the New York Civil Liberties Union (NYCLU).

A. **The Request for Information**

The NYCLU requests the following records:

1. <u>Records received by the United States Department of Homeland Security from the City of New York or the New York City Police Department concerning the "Lower Manhattan Security Initiative."</u> All records[1] received by the United States Department of Homeland Security (DHS) from the City of New York, the New York City Police Department (NYPD), or any entities acting on their behalf or as their agent(s) since January 1, 2002 about the NYPD plan to place a system of surveillance cameras in lower Manhattan in New York City. (Public reports have referred to this program as the "Lower Manhattan Security Initiative." *See, e.g.,* Buckley, Police Plan Web of Surveillance for Downtown, *New York Times*, July 9 2007 at A1 (copy enclosed)). This request specifically includes, but is not limited to, records or portions of records relating to privacy protections, such as provisions concerning types of information collected, access to information collected, use of information collected, retention of information collected, and destruction of information collected. This request also includes, but is not limited to, records

---

[1] The term "records" as used herein includes all records or communications preserved in electronic or written form, including but not limited to correspondence, documents, data, e-mails, faxes, files, memoranda, agreements, notes, orders, policies, procedures, protocols, reports, rules, or studies.
The New York Affiliate of the American Civil Liberties Union | Claudia Angelos, President | Donna Lieberman, Executive Director

relating to the $15 million of DHS funds reportedly being used for the NYPD system (see attached *New York Times* story).

    2. <u>Records sent by the United States Department of Homeland Security to the City of New York or the New York City Police Department concerning the "Lower Manhattan Security Initiative."</u> All records sent by the United States Department of Homeland Security to the City of New York, the New York City Police Department, or any entities acting on their behalf or as their agent(s) since January 1, 2002 about the NYPD plan to place a system of surveillance cameras in lower Manhattan in New York City, as described in request number 1. This request specifically includes, but is not limited to, records or portions of records relating to privacy protections, such as provisions concerning types of information collected, access to information collected, use of information collected, retention of information collected, and destruction of information collected. This request also includes, but is not limited to, records relating to the $15 million of DHS funds reportedly being used for the NYPD system (see attached *New York Times* story), or any documents that authorize the expenditure of funding for the system.

    3. <u>Records Assessing the Proposed "Lower Manhattan Security Initiative."</u> All records, not covered by requests 1 or 2 above, in the possession or control of the Department of Homeland Security (whether created by DHS or not) that evaluate, assess, describe, authorize, or otherwise discuss the NYPD plan to place a system of surveillance cameras in lower Manhattan in New York City, as described in request number 1.

    4. <u>Records Assessing Surveillance Camera Systems.</u> All records, not covered by requests 1-3 above, in the possession or control of the Department of Homeland Security (whether created by DHS or not) that evaluate, assess, describe, authorize, or otherwise discuss surveillance camera systems proposed or employed other than in New York City. This request includes but is not limited to records concerning the so-called "Ring of Steel" system in London, England.

**B.**     <u>**Waiver of all Costs**</u>

    The NYCLU requests a waiver of all costs pursuant to 5 U.S.C. §552(a)(4)(A)(iii) ("Documents shall be furnished without any charge . . . if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester."). Disclosure in this case meets the statutory criteria, and a fee waiver would fulfill Congress's legislative intent in amending FOIA. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be 'liberally construed in favor of waivers for noncommercial requesters.'") (citation omitted).

    Disclosure of the requested information is in the public interest. This request will further public understanding of government conduct; specifically, the implementation of law-enforcement systems intended to monitor and record the lawful and constitutionally protected activity of hundreds of thousands of New Yorkers. The records requested are not sought for commercial use, and the NYCLU plans to disseminate the information disclosed as a result of this FOIA request to the public at no cost via its website and other means.

If this request is denied in whole or in part, we ask that you justify all deletions and exemptions by reference to specific exemptions to FOIA. The NYCLU expects the release of all segregable portions of otherwise exempt material.

We appreciate your prompt attention to this matter. Please furnish all applicable records to me at the above address. If you would like to discuss the scope or any other aspect of this request, please feel free to contact us.

Sincerely,

Christopher Dunn
Matthew Faiella

The New York Times NATIONAL MONDAY, JULY 9, 2007

# POLICE PLAN WEB OF SURVEILLANCE FOR DOWNTOWN

## LIKE LONDON RING OF STEEL

A Call for 3,000 Cameras — New York Seeking More Antiterror Aid

**By CARA BUCKLEY**

By the end of this year, police officials say, more than 100 cameras will have begun monitoring cars moving through Lower Manhattan, the beginning phase of a London-style surveillance system that would be the first in the United States.

The Lower Manhattan Security Initiative, as the plan is called, will resemble London's so-called Ring of Steel, an extensive web of cameras and roadblocks designed to detect, track and deter terrorists. British officials said images captured by the cameras helped track suspects after the London subway bombings in 2005 and the car bomb plots last month.

If the program is fully financed, it will include not only license plate readers but also 3,000 public and private security cameras below Canal Street, as well as a center staffed by the police and private security officers, and movable roadblocks.

"This area is very critical to the economic lifeblood of this nation," New York City's police commissioner, Raymond W. Kelly, said in an interview last week. "We want to make it less vulnerable."

But critics question the plan's efficacy and cost, as well as the implications of having such heavy surveillance over such a broad swath of the city.

For a while, it appeared that New York could not even afford such a system. Last summer, Mr. Kelly said that the program was in peril after the city's share of Homeland Security urban grant money was cut by nearly 40 percent.

But Mr. Kelly said last week that the department had since obtained $25 million toward the estimated $90 million cost of the plan. Fifteen million dollars came from Homeland Security grants, he said, while another $10 million came from the city, more than enough to install 116 license plate readers in fixed and mobile locations, including cars and helicopters, in the coming months.

The readers have been ordered, and Mr. Kelly said he hoped the rest

Continued on Page A14

## Security Plan In New York Calls for Web Of Cameras

Continued From Page A1

of the money would come from additional federal grants.

The license plate readers would check the plates' numbers and send out alerts if suspect vehicles were detected. The city is already seeking state approval to charge drivers a fee to enter Manhattan below 86th Street, which would require the use of license plate readers. If the plan is approved, the police will most likely collect information from those readers too, Mr. Kelly said.

But the downtown security plan involves much more than keeping track of license plates. Three thousand surveillance cameras would be installed below Canal Street by the end of 2008, about two-thirds of them owned by downtown companies. Some of those are already in place. Pivoting gates would be installed at critical intersections; they would swing out to block traffic or a suspect car at the push of a button.

Unlike the 250 or so cameras the police have already placed in high-crime areas throughout the city, which capture moving images that have to be downloaded, the security initiative cameras would transmit live information instantly.

The operation will cost an estimated $8 million to run the first year, Mr. Kelly said. Its headquarters will be in Lower Manhattan, he said, though the police were still negotiating where exactly it will be. The police and corporate security agents will work together in the center, said Paul J. Browne, the chief spokesman for the police. The plan does not need City Council approval, he said.

The Police Department is still considering whether to use face-recognition technology, an inexact science that matches images against those in an electronic database, or biohazard detectors in its Lower Manhattan network, Mr. Browne said.

The entire operation is forecast to be in place and running by 2010, in time for the projected completion of several new buildings in the financial district, including the new Goldman Sachs world headquarters.

Civil liberties advocates said they were worried about misuse of technology that tracks the movement of thousands of cars and people,

Would this mean that every Wall Street broker, every tourist munching a hot dog near the United States Court House and every sightseer at ground zero would constantly be under surveillance?

"This program marks a whole new level of police monitoring of New Yorkers and is being done without any public input, outside oversight, or privacy protections for the hundreds of thousands of people who will end up in N.Y.P.D. computers," Christopher Dunn, a lawyer with the New York Civil Liberties Union, wrote in an e-mail message.

He said he worried about what would happen to the images once they were archived, how they would be used by the police and who else would have access to them.

Already, according to a report last year by the civil liberties group, there are nearly 4,200 public and private surveillance cameras below 14th Street, a fivefold increase since 1998, with virtually no oversight over what becomes of the recordings.

Mr. Browne said that the Police Department would have control over how the material is used. He said that the cameras would be recording in "areas where there's no expectation of privacy" and that law-abiding citizens had nothing to fear.

"It would be used to intercept a threat coming our way, but not to collect data indiscriminately on individuals," he said.

Mr. Browne said software tracking the cameras' images would be designed to pick up suspicious behavior. If, for example, a bag is left unattended for a certain length of time, or a suspicious car is detected repeatedly circling the same block, the system will send out an alert, he said.

Still, there are questions about whether such surveillance devices indeed serve their purpose.

There is little evidence to suggest that security cameras deter crime or terrorists, said James J. Carafano, a senior fellow for homeland security at the Heritage Foundation, a conservative research group in Washington.

For all its comprehensiveness, London's Ring of Steel, which was built in the early 1990s to deter Irish Republican Army attacks, did not prevent the July 7, 2005, subway bombings or the attempted car bombings in London last month. But the British authorities said the cameras did prove useful in retracing the paths of the suspects' cars last month, leading to several arrests.

While having 3,000 cameras whirring at the same time means loads of information will be captured, it also means there will be a lot of useless data to sift through.

"The more hay you have, the harder it is to find the needle," said Mr. Carafano.